1999 OK CR 34

**Jerry Duwane MOONEY, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–95–1140.**

Court of Criminal Appeals of Oklahoma.

Aug. 31, 1999.

---

Sherry Wallace, Oklahoma City, for Defendant at trial.

Luther Cowan, Assistant District Attorney, Cordell, for the State at trial.

Lee Ann Jones Peters, Appellate Indigent Defense, Norman, for Appellant on appeal.

W. A. Drew Edmondson, Attorney General of Oklahoma, William L. Humes, Assistant Attorney General, Oklahoma City, for Appellee on appeal.

## *OPINION*

JOHNSON, Judge:

¶ 1 Jerry Mooney was tried by a jury in the District Court of Washita County, Case No. CF–94–5, before the Honorable Richard Darby. Mooney was convicted of First Degree Malice Aforethought Murder. After finding the existence of three aggravating circumstances—the murder was especially heinous, atrocious, or cruel; the murder was committed to avoid lawful arrest or prosecution; and Mooney posed a continuing threat to society—the jury assessed punishment at death. The trial court sentenced Mooney accordingly. Mooney appeals. After thorough consideration of the record before us, we find the combination of two serious errors affecting the second stage of trial rendered the death sentence in this case unreliable. Therefore, we affirm Appellant's conviction and hereby modify his sentence to life without parole.

## FACTS

¶ 2 On May 11, 1993, sixteen-year-old Jerry Mooney, his fourteen-year-old sister Aimee Mooney and their friend Ricky Fletcher went on a crime spree. At approximately 4:00 a.m., the trio drove to a Love's Truck Stop located on the outskirts of Elk City. Mooney entered the Love's store and got beer and candy bars while Fletcher pumped $18.00 worth of gas into their car. When the clerk turned to turn off the gas pump, Mooney grabbed the merchandise and ran out without paying for the gas or the beer.

¶ 3 Fletcher was driving the car, and the trio fled the area at a high rate of speed. Approximately two to three miles east of the Love's store, they ran the car into a ditch. The three then walked to the nearby home of Richard Turley, a ninety-three-year-old man. Mr. Turley lived at the house by himself.

¶ 4 The three entered the home by kicking in the back door. Mr. Turley, carrying a flashlight, confronted them and asked what they wanted. Mooney told Mr. Turley their car had broken down and asked if they could use Mr. Turley's telephone. Mr. Turley agreed. However, when Mr. Turley checked the damaged door, Mooney took Mr. Turley's flashlight and hit him over the head with it several times. Then, Mooney, Aimee Mooney and Ricky Fletcher repeatedly kicked Mr. Turley "until blood was coming out of his nose and mouth and white stuff was coming out of his nose and mouth and his ears." One of the individuals later hit Mr. Turley once over the head with a cast iron pan.[1]

¶ 5 Before leaving Mr. Turley's home, Mooney took the victim's car keys and his watch. The trio drove the victim's car through the garage door when they were unable to open the garage door.[2] Mr. Turley was found the next morning in a comatose state. He remained in a coma for approximately six months before complications from his injuries caused his death on November 19, 1993.

¶ 6 On May 12, 1993, Mooney and Ricky Fletcher were charged jointly with Robbery with a Dangerous Weapon in Washita County District Court, Case No. CF–93–28. Mooney entered a blind plea of guilty to the robbery charge on November 12, 1993, one week before Mr. Turley died. Mooney was sentenced to life imprisonment for the robbery. On February 3, 1994, the State charged Mooney with First Degree Malice Aforethought Murder. This Court affirmed the robbery conviction in an unpublished opinion on December 6, 1994. *Mooney v. State*, No. C–94–452.[3]

### Issues Relating to Competency

¶ 7 Mooney contends in his fourth assignment of error that the trial court employed an unconstitutional burden of proof when it determined Mooney's competency to stand trial. Prior to any remands, the circumstances surrounding this issue were very sketchy. On March 4, 1994, defense counsel filed an Application for Determination of Competency, setting forth the following facts in support of the application:

A) Defendant suffers from hallucinations and delusions, and his competency has been a continuing source of concern to counsel;

B) Defendant has previously been found to be incompetent to assist his attorney by psychologists at New Horizons Mental Health Services;

C) Further, Defendant's competency has been questioned by the District Court of Washita County, Oklahoma, in CRF–93–28.

---

1. Who hit Mr. Turley with the pan is disputed.

2. After leaving Turley's home, Appellant and Fletcher allegedly broke into a Phillips 66 Service Station. Two Caucasian males, one with blond hair and the other with darker hair, were seen running from the station after the alarm sounded. The owner of the store testified that a concrete block was thrown through the plate glass window. Cigarettes and "possibly some T-shirts" were missing. Evidence regarding this unadjudicated incident was introduced during the sentencing stage of Appellant's trial.

3. Ricky Fletcher was convicted by a jury and sentenced to twenty (20) years imprisonment. This Court affirmed his conviction in an unpublished opinion on December 27, 1995. *Fletcher v. State*, F–94–819.

¶ 8 On March 29, 1994, this matter came on for hearing, but a formal record of the hearing was not made. According to a court minute, Mooney appeared at this hearing with counsel, and Mooney's mother was also present. The court minute also states that Mooney waived his right to a jury trial on the question of competency and the State presented sworn testimony from one witness. At the conclusion of the hearing, Mooney's competency application was denied.

¶ 9 Based upon this record, Mooney contends the March 29th hearing was a post-examination competency trial. The right to a jury trial on the issue of competency only attaches after the initial application for determination of competency has been granted and a competency examination has been conducted. *Compare* 22 O.S.Supp.1993, § 1175.3 (hearing on application to determine competency) *with* 22 O.S.1991, § 1175.4 (post-examination competency trial). Mooney had previously been examined by psychologists during the course of the companion robbery case.[4] Thus, Mooney contends we can presume this hearing was a post-examination competency trial and that the unconstitutional "clear and convincing" burden of proof was employed by the trial court in violation of *Cooper v. Oklahoma*, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996).[5]

¶ 10 The State conceded error in its brief and requested the matter be remanded to the district court for retrospective competency proceedings. Upon initial review of the limited record available on this issue, this Court also found merit with Mooney's claim. However, it subsequently became apparent that the record was misleading. Consequently, on March 5, 1998, this matter was remanded to the district court for an evidentiary hearing to determine whether the March 29th hearing was simply a hearing on Appellant's Application to Determine Compe-

tency[6] or whether it was actually a post-examination competency trial.[7]

¶ 11 On March 20, 1998, the Honorable Richard B. Darby, District Judge, found that the March 29, 1994 hearing conducted by Judge Ralph Emerson was simply a hearing on Mooney's Application to Determine Competency and not a post-examination competency trial. At the evidentiary hearing, Judge Emerson testified the March 29th hearing was a hearing on Mooney's Application. He recalled that "not a scintilla of evidence" was presented during the hearing to call into question Mooney's competency. He further testified that Mooney always appeared competent, was "very lucid" and "very alert." Assistant District Attorney Luther Cowan similarly testified that there was no evidence presented that Mooney was incompetent. Mr. Cowan recalled that John Rizzi, a jailer, testified at the hearing that he had no problems communicating with or understanding Mooney.

¶ 12 The March 29th hearing was clearly a hearing on Mooney's Application for Determination of Competency. This Application was denied; and consequently, Mooney was not entitled to a post-examination competency trial. Mooney's fourth assignment of error fails.

### Pretrial Issues

¶ 13 In his first assignment of error, Mooney contends he had already been punished for the acts resulting in Mr. Turley's death through his robbery conviction. Thus, Mooney maintains his subsequent prosecution for the same course of conduct violates (1) Title 21, Section 11 of the Oklahoma statutes and (2) the prohibition against double jeopardy found in the federal and state constitutions.

¶ 14 Analysis of this issue begins with a review of 21 O.S.1991, § 11. *Hale v.*

4. Prior to the filing of this case, Mooney and Ricky Fletcher were charged jointly with Robbery with a Dangerous Weapon in Washita County District Court, Case No. CF-93-28. One week after entering a blind plea of guilty to the robbery charge, the victim of the robbery died from injuries sustained during the robbery. Thereafter, the State charged Mooney with First Degree Malice Aforethought Murder.

5. The *Cooper* decision was not issued until April 16, 1996, approximately two years after the hearing in question.

6. *See* 22 O.S.Supp.1993, § 1175.3.

7. *See* 22 O.S.1991, § 1175.4.

*State*, 1995 OK CR 7, ¶¶ 3–5, 888 P.2d 1027, 1029. "If a single criminal act gives rise to offenses which are not separate and distinct, are a means to another ultimate objective, are lesser included offenses, or are incidents or facets of some other offense, that conduct may not be punished under more than one statute." *Hale*, 1995 OK CR 7, ¶ 4, 888 P.2d at 1029; 21 O.S.1991, § 11. The pivotal issue is whether "a defendant has been punished twice for one criminal course of conduct where his offenses were incident to one objective." *Id.* A traditional double jeopardy analysis is only conducted if section 11 does not apply. *Id.*, 1995 OK CR 7, ¶ 5, 888 P.2d at 1029.

¶ 15 When applying section 11, the pivotal question is what Mooney's objective was—robbery and/or murder. Mooney submits he has been punished twice for *one* criminal course of conduct that involved the *single objective* of robbery. The facts proving each offense are clearly intertwined. To prove the offense of robbery with a dangerous weapon, the State had to prove the flashlight was a dangerous weapon.[8] This was demonstrated by showing how Mooney used the flashlight to beat Mr. Turley. This same beating ultimately resulted in Mr. Turley's death. Moreover, evidence of the beating was necessary to prove both the robbery with a dangerous weapon and the murder.

¶ 16 However, it is clear from Mooney's statements to Rene Brasuell that Mooney had two criminal objectives. Mooney told Brasuell the trio killed Mr. Turley to avoid witnesses. Therefore, by Mooney's own admission, he had two separate objectives— robbery and malice murder to avoid prosecution. The chain of events relayed to Brasuell

was as follows: After entering Turley's home, Mr. Turley came out and asked what they were doing. The trio told him their car had broken down and asked to use the phone. Fletcher went to call his mother. Mr. Turley went to lock the door and told them they could stay the night, wait until daylight and get his car out. Mooney took the flashlight and hit Mr. Turley over the head three or four times. Mr. Turley fell to the floor. Believing Mr. Turley was unconscious, the trio began looking for Mr. Turley's car keys. When Mr. Turley started to get up, Mooney started kicking him and hollered for the others to join in, saying they had to kill him to avoid witnesses. In light of this evidence, we find section 11 is not applicable to this case.

¶ 17 We must now conduct a traditional double jeopardy analysis. *See Hale*, 1995 OK CR 7, ¶ 5, 888 P.2d at 1029. In cases of multiple punishment in a single trial, this Court utilizes the "same evidence" test (whether each offense contains an element not contained in the other). *Id.* For cases involving multiple trials, the Court has been applying the "same transaction" test (did the offenses arise from the same criminal conduct). *Id.* However, at this time we adopt the Supreme Court's decision in *United States v. Dixon*, 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993), *overruling Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990)[9] and do away with the "same transaction" test. The Court in *Dixon* found the application of the "same conduct/transaction" test in multiple prosecution cases was "wholly inconsistent with earlier Supreme Court precedent and with the clear common-law understanding of double jeopardy." *Dixon*, 509 U.S. at 704, 113 S.Ct. at

---

8. Although an assault with a weapon is not generally a required element of robbery with a dangerous weapon, where, as here, the weapon is not an inherently dangerous object, but is an ordinary object made dangerous by its use, the assault is essential to the charge. *See e.g. Pitts v. State*, 1982 OK CR 121, ¶ 10, 649 P.2d 788, 791 ("[A]lmost any ordinary object used in a manner which may cause death or great bodily harm may be considered as a dangerous weapon under 21 O.S.1981, § 801. The manner in which the object is used generally is the determinative factor as to whether the object can be considered a dangerous weapon.").

9. In *Grady v. Corbin*, the Court held that in addition to passing the "same elements" test, a subsequent prosecution must also satisfy a "same conduct" test to avoid a double jeopardy problem. The *Grady* test provided that a second prosecution could not be had "if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted...." 495 U.S. at 510, 110 S.Ct. at 2087.

2860. We find the Court's reasoning compelling and adopt *Dixon* at this time.[10]

¶ 18 Applying the "same evidence" test, Mooney's double jeopardy claim clearly fails. Malice murder and robbery with a dangerous weapon each contain elements that are not contained in the other. *See* 21 O.S.1991, § 701.7; 21 O.S.1991, § 801. Thus, this allegation of error fails.

¶ 19 In his third proposition of error, Mooney asserts the State's failure to provide a complete record of the competency and reverse certification proceedings violated his rights under both the Oklahoma and United States Constitutions. Mooney contends that the State's failure to ensure that these proceedings were recorded by a court reporter resulted in a wholly inadequate record on vital issues in the case. As a result, Mooney submits his conviction should be reversed.

¶ 20 When the State seeks the ultimate penalty of death, the State bears the responsibility of ensuring that the record is sufficient enough to enable the Court to conduct the mandatory sentence review mandated by 21 O.S.1991, § 701.13. Failure to do so is reversible error if the missing record is necessary for the Court to conduct its review. *Van White v. State,* 1988 OK CR 47, ¶¶ 13–17, 752 P.2d 814, 820–21.

¶ 21 In the instant case, the State's failure to make a proper record of Mooney's competency proceedings was cured when this matter was remanded to the district court on March 5, 1998, for an evidentiary hearing. The evidentiary hearing was conducted on March 17, 1998, and sufficiently recreated Mooney's competency proceedings. It is abundantly clear from the record on remand that Mooney's Application for Determination of Competency was denied. No further record of these proceedings is necessary for the Court to conduct its mandatory sentence review.

¶ 22 We also find no merit to the second half of Mooney's argument—that the State failed to properly preserve the reverse certification proceedings for appellate review. First, the reverse certification proceedings held in conjunction with the present case were transcribed. The fact that no evidence was presented at that time was Mooney's choice. At the close of Mooney's preliminary hearing in this case, the court addressed Mooney's motion to transfer the case to the juvenile division of the district court. Instead of presenting evidence, defense counsel asked the court to incorporate the evidence from the reverse certification hearing previously held in Mooney's robbery case. Thereafter, the trial court denied Mooney's reverse certification motion.

¶ 23 Mooney's actual complaint deals with the fact that the reverse certification proceedings held in his robbery case were not recorded. This Court still adheres to the rule in non-capital cases that the burden is upon the defendant to ensure a complete record for appellate review. *See Van White,* 1988 OK CR 47, ¶¶ 13–14, 752 P.2d at 821. Mooney's decision to rely on evidence presented in conjunction with his non-capital robbery case cannot now be the basis for reversal in the present case. The reverse certification proceedings held in the instant case were recorded and transcribed.

¶ 24 Moreover, Mooney failed to timely appeal the trial court's denial of his reverse certification motion. Title 10 O.S. 1991, § 1104.2(E) provides that "[a]n order certifying a person as a child or denying the request for certification as a child ... [is] a final order, appealable when entered." An appeal from an order in a juvenile certification proceeding must be perfected within sixty (60) days after the date of the order. 10 O.S.1991, § 1123(B). Mooney failed to perfect a timely appeal from the court's certification orders in both his robbery case and in this case. Thus, it is now improper for Mooney to assert error occurred at those proceedings. This proposition of error fails.

10. In his reply brief, Mooney contends the application of *Dixon* to the present case violates the prohibition against *ex post facto* laws. We disagree. This change does not violate the Due Process Clause or *ex post facto* principles as it does not change the crime for which Mooney is charged, increase the punishment prescribed or increase the quantity or degree of proof necessary to establish his guilt. *See Selsor v. Turnbull,* 1997 OK CR 61, ¶ 10, 947 P.2d 579, 583.

¶ 25  In his seventh assignment of error, Mooney submits that Oklahoma's reverse certification statutes are inadequate to insure that a sixteen-year-old offender is sufficiently mature and morally responsible to be subjected to the death penalty. Mooney recognizes that the execution of a person who was sixteen or seventeen years old at the time they committed their crime does not violate the Eighth Amendment. *Stanford v. Kentucky*, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). However, Mooney asserts that an essential underpinning of the ruling in *Stanford* is that in Kentucky and Missouri, the states wherein the cases arose, sixteen and seventeen-year-olds are given individual consideration as to their personal maturity and moral responsibility before being held to stand trial as an adult. *Id.* 492 U.S. at 375, 109 S.Ct. at 2978.

¶ 26  Mooney's argument is misplaced. The purpose of section 1104.2 is to determine whether a sixteen or seventeen-year-old offender should be prosecuted as an adult or whether he should be treated as a juvenile. *Hain v. State*, 1993 OK CR 22, ¶ 12, 852 P.2d 744, 748.[11] The reverse certification process is a preliminary, pre-trial stage of a prosecution. *Id.* "Defining the class of offenders potentially eligible for the death penalty is not a function of 10 O.S.Supp.[1993], § 1104.2." *Id.* This Court has repeatedly held the standards set out by section 1104.2 are appropriate and protect the constitutional guarantees of the individual offender. *Hain*, 1993 OK CR 22, ¶ 14, 852 P.2d at 748, *citing A.M.H. v. State*, 1988 OK CR 269, 766 P.2d 351; *G.E.D. v. State*, 1988 OK CR 42, 751 P.2d 755; *Trolinger v. State*, 1987 OK CR 71, 736 P.2d 168.

¶ 27  The *Stanford* Court found "neither a historical nor a modern societal consensus forbidding the imposition of capital punishment on any person who murders at 16 or 17 years of age." *Stanford*, 492 U.S. at 380, 109 S.Ct. at 2980. A defendant's age, maturity and moral responsibility are certainly relevant mitigating factors to be considered by the sentencer. However, Mooney has failed to demonstrate how Oklahoma's reverse certification process offends any of his constitutional protections. Consequently, this proposition of error is denied.

### Issues Relating to Guilt/Innocence

¶ 28  Mooney contends in his second assignment of error that the admission of State's Exhibit 1 stripped him of the presumption of innocence and violated various statutory provisions and constitutional rights. State's Exhibit 1 was comprised of the Information, a Waiver of Rights, the Summary of Facts and the Judgment and Sentence from Mooney's robbery with a dangerous weapon case. Mooney submits that these documents: (1) were inadmissible under 12 O.S.1991, § 2404(B);[12] (2) were inadmissible under 22 O.S.1991, § 860;[13] (3) were inadmissible hearsay; and (4) violated his presumption of innocence. Mooney further contends his guilty plea to the robbery was not voluntarily and knowingly entered for the purpose it was used. Finally, Mooney submits the trial court's decision to admit the challenged evidence interfered with his right to counsel.

¶ 29  Even if error occurred by the admission of any part of State's Exhibit 1, Mooney has failed to demonstrate any prejudice. In addition to pleading guilty to the robbery charge, Mooney made admissions to Rene Brasuell and Kenneth McAllister.[14] Moreover, the two crimes are distinct and different even though a great amount of evidence relied upon to support Mooney's rob-

---

**11.** Contrary to Appellant's assertion, section 1104.2 does not create an irrebuttable presumption that a sixteen or seventeen year old person who commits murder is mature enough and morally responsible enough to be punished as an adult.

**12.** "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, in-

tent, preparation, plan, knowledge, identity or absence of mistake or accident."

**13.** Title 22, Section 860 deals with the introduction of second or subsequent offenses.

**14.** Appellant also allegedly made statements to David Cox. However, in light of the error discussed in Proposition XIII, these admissions were not considered.

bery conviction overlapped with the evidence in Mooney's murder trial. However, State's Exhibit 1 did not prove that Mooney killed Mr. Turley with malice aforethought. Therefore, the admission of State's Exhibit 1 did not violate Mooney's presumption of innocence. Finally, the trial court properly instructed the jury it could not consider evidence that Mooney had committed other offenses as proof of Mooney's guilt or innocence in this case. (O.R.531) Thus, this proposition of error is denied.

¶ 30 In his fifth assignment of error, Mooney contends the trial court erred when it refused to give an instruction on the lesser-included offense of first degree manslaughter. The trial court instructed the jury on voluntary intoxication and on the lesser-included offense of second degree murder. Citing *Pickens v. State*, 1994 OK CR 74, 885 P.2d 678, 682–83, *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) and *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), Mooney submits the trial court was additionally required to give his requested manslaughter instruction. We disagree.

■■■■ ¶ 31 As we discussed in *Charm v. State*, 1996 OK CR 40, ¶ 7, 924 P.2d 754, 760, lesser-included offense instructions need not automatically be given in death cases, but are required only when supported by the evidence. The evidence in this case did not support an instruction on first degree manslaughter. A homicide is first degree manslaughter "[w]hen perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon. . . ." 21 O.S. 1991, § 711(2). There was no evidence presented in this case that reasonably suggests Mooney committed this murder in the heat of passion. The evidence demonstrated that without adequate provocation, Mooney struck Mr. Turley over the head three or four times with a flashlight. Thereafter, the victim was repeatedly kicked. These facts do not support a first degree manslaughter instruction.

¶ 32 Mooney submits next that the second degree murder instructions were contradictory, confusing and inaccurate. Mooney directs this Court's attention specifically to

Jury Instruction Nos. 14 and 15 which mirror the Oklahoma Uniform Jury Instructions—Criminal (hereinafter OUJI–CR) 450 and 451. Instruction number 14 stated:

> A person may be convicted of Murder in the Second Degree if he engages in conduct imminently dangerous to another person that shows a depraved mind in extreme disregard of human life, although the conduct is not done with the intention of taking the life of or harming any particular individual.

Instruction number 15 stated:

> Conduct shows a depraved mind where it is *accompanied by an intent to do serious bodily injury to another or to others*, although the conduct is not done with the intention of taking the life of any particular individual. (emphasis added)

In order to return a verdict on second degree murder under the instructions given, Mooney submits that the jury would have had to find the impossible: that Mooney did not intend to harm the decedent, yet did intend to do serious bodily injury to him. Due to this conflict, Mooney contends the jury was deprived of an opportunity to convict him of an appropriate degree of homicide if they believed he was intoxicated. Mooney may well be correct.

■■■■ ¶ 33 However, in *Willingham v. State*, 1997 OK CR 62, ¶ 27, 947 P.2d 1074, 1081, this Court recently determined that second degree murder is not a lesser-included offense of first degree malice murder. Moreover, from an evidentiary perspective, the second degree murder instructions were inappropriately given by the trial court. Second degree murder is defined as a homicide "perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of *any particular individual* . . . ." 21 O.S.1991, § 701.8(1) (emphasis added). It is clear from Mooney's admission to Rene Brasuell that Mooney intended to kill one specific person—Richard Turley. Therefore, the second degree murder instructions were inappropriately administered by the trial court. *See Charm*, 1996 OK CR

40, ¶ 10, 924 P.2d at 760–61. Under these circumstances, Mooney cannot now be heard to complain regarding the second degree murder instructions he received.

¶ 34 Moreover, the evidence arguably did not support a jury instruction on the defense of voluntary intoxication. Mooney described his actions and reactions during the robbery/homicide in detail to Rene Brasuell. Therefore, it is difficult to conclude Mooney was significantly intoxicated at the time of the incident. *See Charm*, 1996 OK CR 40, ¶ 11, 924 P.2d at 761; *Valdez v. State*, 1995 OK CR 18, ¶ 56, 900 P.2d 363, 379.

¶ 35 Finally, Mooney submits the trial court erred when it failed to give OUJI–CR 911 which instructs a jury of its authority to find a defendant "guilty of any offense, the commission of which is necessarily included in the crime(s) charged." Mooney failed to request the jury be given OUJI–CR 911. Thus, he has waived this issue and we will only review this allegation for plain error. As the evidence did not support the giving of the second-degree murder instructions, the trial court's failure to administer OUJI–CR 911 was harmless.

¶ 36 Mooney asserts in his sixth assignment of error that prosecutorial misconduct in both stages of the trial so infected the proceedings as to deprive Mooney of a fair trial and sentencing hearing. Due to errors found in the sentencing stage of trial, Mooney's allegations of misconduct during the guilt/innocence stage of trial will only be addressed here.

¶ 37 Mooney first contends the prosecutor improperly informed the jury during voir dire that voluntary intoxication was not a defense to murder. Upon review, we find any error in this regard was cured by the trial court in response to defense counsel's objection. *See Smith v. State*, 1996 OK CR 50, ¶ 29, 932 P.2d 521, 531–32, *cert. denied*, 521 U.S. 1124, 117 S.Ct. 2522, 138 L.Ed.2d 1023 (1997). Furthermore, the jury was properly instructed at the close of the guilt stage regarding the defense of volun-

tary intoxication. The court's instructions cured any error which may have resulted from the prosecutor's misstatements.

¶ 38 Mooney next complains of discovery violations which allegedly occurred throughout the trial. While Mooney asserts numerous discovery violations occurred, Mooney's brief only addresses one discovery violation with any specificity. This violation concerns David Cox, a witness for the State. Mr. Cox is also the topic of Mooney's thirteenth proposition of error. Consequently, the specifics of this claim will be addressed with Mooney's thirteenth assignment of error.

¶ 39 Mooney also argues the prosecutor improperly implied Cox's life was in danger because of defense counsel's and Mooney's conduct. This allegation of error is clearly erroneous as the State's questioning regarding Cox's fear of retaliation was made in direct response to questioning by defense counsel. *See Hooper v. State*, 1997 OK CR 64, ¶ 20, 947 P.2d 1090, 1100, *cert. denied*, —— U.S. ——, 118 S.Ct. 2353, 141 L.Ed.2d 722 (1998)(a defendant is not entitled to relief when error is invited).

¶ 40 During cross-examination, defense counsel asked Cox what reasons he had given inmates in the county jail for his presence there. When the State objected to the question, defense counsel stated that it went to his "truth and veracity, if he lied about what he was doing there." Cox ultimately responded that he had told the inmates he was there to get his time cut. Thereafter, defense counsel asked him what else he had lied about. On redirect, the State sought to explain why Cox had lied to other inmates by explaining he feared retaliation for being a snitch.[15] Thus, contrary to Mooney's assertion, the State was not intentionally trying to cast aspersions on defense counsel.

¶ 41 With regard to misconduct during the guilt/innocence phase of the trial, Mooney finally contends the prosecutor improperly called Mooney a "liar." The trial court sustained Mooney's objection to the comment and admonished the jury to "disre-

---

**15.** The challenged questioning/testimony further explained why Mr. Cox had been reluctant to answer defense counsel's questions regarding Cox's family members names and their addresses.

gard the reference to anyone as a liar." This Court has consistently held that an admonishment by the trial court regarding erroneous comments cures any error which does not substantially affect the verdict. *Clayton v. State,* 1992 OK CR 60, ¶ 38, 840 P.2d 18, 29, *cert. denied,* 507 U.S. 1008, 113 S.Ct. 1655, 123 L.Ed.2d 275 (1993); *James v. State,* 1987 OK CR 79, ¶ 13, 736 P.2d 541, 545. The prosecutor's passing remark in the instant case was not outcome determinative. This allegation fails.

¶ 42  In his thirteenth proposition of error, Mooney contends the State failed to provide adequate discovery regarding its witness, David Cox, and that the trial court failed to grant an adequate remedy. In conjunction with this argument, on September 24, 1996, Mooney's counsel filed an Application for Evidentiary Hearing on Sixth Amendment Claims. The claim was the State's inadequate discovery coupled with the trial court's refusal to grant an adequate remedy created "state-imposed ineffective assistance of counsel."

¶ 43  At trial, just before Cox took the stand, defense counsel informed the court that the prosecutor had indicated Cox had written him a letter. Counsel was concerned because she had not received a copy of the letter. At this time, the prosecutor admitted he had received two letters from Cox that were not provided to Mooney. The prosecutor argued the contents of the letters were not Mooney's or defense counsel's business. The trial court read the letters, and then ordered the prosecutor to provide defense counsel with copies of the letters.

¶ 44  The letters contained information that was not included in the OSBI report that was received before trial. Specifically, the letters contained Cox's purported motive for testifying against Mooney.[16]  In the letters and on the witness stand, Cox claimed

that his grandfather was killed in Texas in 1986 by two teenagers who broke into his home at night—facts similar to the instant case. The letters also contained information that this case was not Cox's first experience as an informant and that he was up for parole in November.

¶ 45  After Cox testified on direct examination, court recessed for the remainder of the day so defense counsel could prepare for cross-examination. The next morning, defense counsel reminded the court that on three separate occasions during the trial she had been presented with documents that should have been turned over during discovery. Defense counsel moved for a mistrial based upon prosecutorial misconduct. At a minimum, defense counsel requested the trial court sanction the District Attorney's Office pursuant to Title 22, Section 2002. When the trial court denied defense counsel's motion for mistrial, counsel requested an additional continuance asserting weekday business hours were necessary to conduct a proper investigation into Cox's motive for testifying. The request for continuance was also denied. Thereafter, defense counsel proceeded to cross-examine Mr. Cox.

¶ 46  Later that day, after Cox's cross-examination and prior to calling the first defense witness, defense counsel again moved for a continuance to continue the investigation pertaining to David Cox. The trial court agreed to allow defense counsel to postpone resting the defense case until after the weekend to provide more opportunity for investigation. On appeal, Mooney submits that had defense counsel been given adequate time to investigate, she would have discovered what she had suspected was true: that David Cox was lying about his motive for testifying.[17]

---

16.  It should be noted that Cox refused to be interviewed by defense counsel prior to trial.

17.  Appellant further submits that had a sufficient continuance been granted, he would have been able to present evidence demonstrating Cox lied about the letter Appellant allegedly sent to his father, Harry Mooney. Cox testified that Appellant wrote a letter to his father planning an escape from the county jail and planning to kill

the prosecutor. While Appellant may have been able to impeach Cox's testimony regarding this letter, this impeachment evidence could have been obtained before trial as information regarding the alleged letters sent between Appellant and his father was provided to Appellant prior to trial in the OSBI Report titled "Interview of David Dawayne Cox."

¶ 47 In consideration of the proposition raised and the Application for Evidentiary Hearing on Sixth Amendment Claims, on December 1, 1998, we remanded this matter to the trial court for an evidentiary hearing. An evidentiary hearing was conducted by the Honorable Richard Darby on February 22 and 23, 1999. Pursuant to this Court's directive, Judge Darby filed Findings of Fact and Conclusions of Law Regarding Trial Testimony of David Cox on April 30, 1999.

¶ 48 At the evidentiary hearing, Mooney's appellate counsel established through substantial evidence that the State's witness, David Cox, was "prone to misrepresentation and manipulation for many years, both in and out of the penal system." *See Findings of Fact*, filed April 30, 1999. Appellate counsel established through testimony and documentary evidence Cox's past emotional problems and family history. Counsel established Cox's purported motive for testifying—that his own grandfather was murdered under circumstances similar to those present in this case—was an absolute falsity.[18] Counsel established that, in fact, Cox's true motive for testifying was self-serving and was to protect himself from harm from other inmates by obtaining relocation within the prison system. Also admitted at the evidentiary hearing was an affidavit signed by Harry Mooney, Appellant's now-deceased father, which totally contradicted Cox's testimony that Appellant had mailed a letter to his father wherein he discussed plans to escape from the Washita County Jail. Other evidence was also admitted at the evidentiary hearing which impeached the credibility of Cox's testimony—including his own mother's testimony that Cox was a liar and that one could not believe anything he said.

¶ 49 At the evidentiary hearing, appellate counsel stipulated that certain evidence "could have been obtained quickly and easily by telephone in 1995." The evidence referred to was information obtained from the Harris County Medical Examiner's Office that no record of a body identified as Ed Raley came through that office in 1986. The other piece of evidence which could have readily been obtained by telephone was that the Houston Police Department reported no record of a homicide of Ed Raley in the Houston area in 1986.

¶ 50 The trial court ultimately found that the two letters which were not turned over to Mooney's trial counsel until August 24, 1995 should have been provided to trial counsel as part of pre-trial discovery and that "the State was wrong in not providing these letters to trial counsel...." Even though the State wrongfully did not provide this discovery material in a timely fashion, the trial court determined the information proving Cox's testimony about his grandfather was false was available to counsel at the time of trial— because the impeachment evidence was "available by telephone inquiry and could have been obtained quickly and easily" as evidenced by the stipulations offered at the evidentiary hearing. Therefore, the trial court found that Mooney's trial counsel was not precluded by the State's action from presenting the relevant bias evidence.

¶ 51 While, in fact, some impeachment evidence showing bias might have been available to trial counsel, we recognize that the stipulations—that some evidence was available by telephone—do not establish or conclusively show the evidence could have been obtained in one late afternoon telephone call. Whether the brief continuance provided by the trial court allowed defense counsel a meaningful opportunity to obtain evidence proving Cox's bias and untruthfulness is not clear. The stipulations entered at the evidentiary hearing merely show that such information could have been obtained over the telephone. Appellant's trial counsel testified at the evidentiary hearing that, after the State provided her with Cox's letter, the trial court recessed "early"—"about three or four o'clock in the afternoon"—to give her some time to prepare for cross-examination of Cox. Trial counsel testified that she "attempted to do some [investigation] but none was successful." [19]

---

18. Cox's grandfather, Ed Raley, testified at the evidentiary hearing.

19. Trial counsel said that she tried to verify Cox's story about "informing on two brothers in Tulsa" by contacting her private investigator in Oklahoma City. She also drove to Roger Mills Coun-

¶ 52 "Exposure of a witness's motive to testify is a proper and important function of cross-examination." *Livingston v. State*, 1995 OK CR 68, ¶ 15, 907 P.2d 1088, 1092–93. *See also Martinez v. State*, 1995 OK CR 52, ¶ 13, 904 P.2d 138, 141; *Mitchell v. State*, 1994 OK CR 70, ¶ 32, 884 P.2d 1186, 1198; *cert. denied*, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995). "[B]ias is never collateral, and the right to impeach for bias is construed liberally...." *Livingston*, 1995 OK CR 68, ¶ 15, 907 P.2d at 1093. Three factors govern the admissibility of this type of evidence: "it must be (1) relevant, (2) otherwise admissible under constitutional and statutory authority, and (3) its probative value must not be substantially outweighed by the danger of unfair prejudice." *Martinez*, 1995 OK CR 52, ¶ 16, 904 P.2d at 141. Evidence that Mr. Cox was lying regarding his motive to testify satisfies these conditions; and, certainly if defense counsel had been provided timely discovery and afforded sufficient time to establish Mr. Cox was lying about his reason for testifying, the remainder of his testimony would have been rendered highly suspect.

¶ 53 We find error clearly occurred as a result of the State's failure to make a timely and voluntary disclosure of Cox's letters to defense counsel prior to trial and this error is subject to harmless error analysis. *Livingston*, 1995 OK CR 68, ¶ 17, 907 P.2d at 1093. These letters contained relevant information necessary to properly confront and cross-examine Mr. Cox. *See Livingston, Id.; Martinez*, 1995 OK CR 52, ¶ 18, 904 P.2d at 141; *Mitchell*, 1994 OK CR 70, ¶ 32, 884 P.2d at 1198. It is also evident that these letters were known to the prosecutor and were not disclosed until the court ordered such disclosure.

The deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with the "rudimentary demands of justice." *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935). When the reliability of a witness may be determinative of the guilt or innocence of the defendant, nondisclosure of evidence affecting his credibility falls within this general rule. A new trial is required if the false testimony could have affected the judgment of the jury. *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

*Reed v. State*, 1983 OK CR 12, ¶ 7, 657 P.2d 662, 664, *cert. denied*, 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 30 (1983); *Housley v. State*, 1989 OK CR 84, ¶ 5, 785 P.2d 315, 316. Here, there was no evidence to suggest that the State knew its witness was untruthful or unreliable, but the State also made no such inquiry into his truthfulness and veracity prior to trial. It is unclear whether the error was deliberate. Nevertheless, this witness's reliability was not determinative of Mooney's guilt or innocence.

¶ 54 We cannot say, however, that the State's failure to make a timely disclosure of evidence relevant to the witness Cox's reliability and trial counsel's inability to investigate was harmless in the second stage of Mooney's trial. When conducting a harmless error analysis, "[w]e must ask 'whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.'" *Livingston*, 1995 OK CR 68, ¶ 17, 907 P.2d at 1093.

¶ 55 David Cox testified for the State in both stages of trial. Cox's testimony was relatively consistent with other evidence presented except for the following additions:

1. Mooney was the one who hit the victim in the head with the frying pan, and he was getting his sister to testify that she did it because she would receive immunity and nothing would happen to her.

2. Ricky Fletcher tried to call 911 in an attempt to help the victim, but Mooney jerked the phone out of the wall and prevented the victim from receiving medical assistance.

---

ty to interview Cox, which took about an hour and a half, and then Cox refused to talk to her. Because Cox was the State's last witness, she also had to prepare her case for trial the next day. The following morning was a Friday and the trial court denied her motion for further continuance. (Transcript of Evidentiary Hearing at 20–22)

3. Mooney said he would not change anything if he could, except getting caught.

4. Mooney was planning to escape from the county jail and kill the prosecutor.

¶ 56 With regard to the guilt/innocence portion of this trial, we find the error that occurred was harmless beyond a reasonable doubt. Cox's testimony, for the most part, was cumulative and consistent with Mooney's admissions to Rene Brasuell and to Kenneth McAllister. In its Findings of Fact and Conclusions of Law filed in this Court following the evidentiary hearing on the Sixth Amendment claims, Judge Darby likewise determined that the effect of impeaching David Cox's credibility and testimony on the first stage of trial "would have been minimal, and not sufficient to change the verdict."

¶ 57 However, with regard to the punishment phase of trial, the trial court was unable to conclude on remand, and we too are unable to conclude, that the error was harmless beyond a reasonable doubt. Cox was the State's star witness in support of the continuing threat aggravator. The only evidence presented in support of this aggravator was the crime itself, evidence of two unadjudicated property crimes that occurred the same night as the homicide, and Cox's testimony that Mooney had told him that after his "escape" he planned to kill the prosecutor. Cox's testimony depicted Mooney as an unremorseful, manipulative killer, who would kill again. Cox's testimony that Mooney intended to escape and kill the prosecutor was clearly the most compelling and relevant evidence in support of the continuing threat aggravator.[20] Secondly, the jury was deadlocked as to sentencing,[21] and it is unclear whether the jury would have rendered a death sentence had Mooney exposed and effectively confronted and impeached Cox regarding his motive for testifying.

¶ 58 Thus, under the circumstances presented here and in consideration of the error which is discussed below, we find Mooney's sentence of death cannot stand and hereby order Mooney's death sentence modified to life imprisonment without the possibility of parole.

### Issues Relating to Sentencing Stage

¶ 59 Modification of Mooney's death sentence renders the majority of Mooney's sentencing stage issues moot. However, Mooney's eighth proposition of error must also be addressed. Therein, Mooney contends that the jury was coerced into returning a sentence of death.

¶ 60 The allegation hinges on events which transpired during the jury's second stage deliberations. Just before the jury began deliberations in both the first and second stages of the trial, the court stated, "If you need to communicate with the Court, write out your communication on a piece of paper and give it to the bailiff. The bailiff will give it to me and I will respond in writing and the bailiff will deliver my response to you." Several different jurors sent out notes during the first and second stage deliberations.

¶ 61 Approximately four hours after jury deliberations began in the sentencing stage of trial, the following note signed by Juror Garrison was sent out by the jury:

> What if some are only going to decide one way and others the other way and no one is going to change their mind[?] What do we do? 10 death 2 life without parole[.]

After a great deal of discussion, the court decided to return the jury to the courtroom and deliver the *Allen* charge contained in OUJI–CR 910. Thereafter, the jury deliber-

---

**20.** Cox testified at the evidentiary hearing and admitted much of his trial testimony was untruthful. He admitted his testimony about Appellant's alleged plan to escape was not true, nor was his testimony that he was convicted in Nevada for maiming, or his testimony about a 1987 conviction for arson. He said he lied when he told the prosecutor he had killed a man who attacked his sister. He admitted Mooney did not hit Mr. Turley in the head with the pan, but rather just told Cox he (Mooney) was taking the blame for his sister. Cox said he also lied when

he said Mooney yanked the phones out of the wall to prevent them from calling 911. He lied when he said Mooney bragged about killing "the old man." He lied about the "escape plan" and lied about Mooney saying he was going to kill the prosecutor. He also admitted he lied about his grandfather's alleged murder to have a reason to testify.

**21.** *See* Proposition VIII.

ated approximately two more hours before the court received the jury's fifth and final note. This note, signed by Juror Henry, read:

[A]t what time will you take this case out of our hands? If we stay dead locked is this a miss trial [sic]?

After hearing argument from the State and defense counsel, the court decided to return the jury to the courtroom, ask the foreman if they had reached a unanimous verdict, and if they had not, instruct the jury that if they could not agree unanimously on punishment, the court would discharge the jury and impose a sentence of either life or life without parole. The bailiff was sent to return the jury to the courtroom. However, instead of returning with the jury, the bailiff returned with a message that the jury wanted to continue its deliberations. The bailiff explained:

I went back up to tell them that they were to come down and they were wondering why. They hadn't all shared the note that was given to me, and they said that they were wanting to continue working.

Because of this information, the court changed tactics and instructed the jury as follows:

Ladies and gentlemen of the jury, I have received and reviewed your most recent note. We had discussed that with counsel and the defendant and was prepared to give you further instruction in that regard. It then came to our attention through the bailiff that possibly not all of you were aware of what the note said. We've noticed on some of your notes that some—or one was signed by the foreman. Other notes have been signed by individuals who are not the foreman. To avoid confusion and to assist in your deliberations, what I'm going to instruct you at this time is that this note will not be addressed by the Court. You are ordered to continue your deliberations and the foreman will sign further notes. And the foreman is directed that if a question needs to be presented to the Court, to address it and write it and sign it and the Court will review it and give you further instructions thereto. I am not in any way insinuating or ordering that if the question does not come immedi-

ately from the foreman that it is not to be asked. That's not what I'm saying. What I am saying is that to assist and properly assist you in deliberations and so that they will be proper, the foreman should be aware of what the question is and what notes should be given and the foreman can handle that in that person's own way as far as further discussion or submission to the Court. I know you've have had a long afternoon and it's been some time since lunch. I would offer to you to provide some further food or refreshments if you think that would be beneficial. So at this time, I would ask you to return to the deliberation room. Discuss the matters that I have instructed you now on openly, as you have been ordered to do, and the foreman can advise the bailiff upon your further deliberations what your request would be. Thank you, and you will return to the jury room.

The jury retired to deliberate further, then returned with a verdict of death after an unrecorded length of time.

¶ 62 On appeal, Mooney contends the following factors combined resulted in a coerced verdict: (1) the influence of the *Allen* charge; (2) the bailiff's improper communication with the jury; (3) the trial court's refusal to answer the jury's final question regarding what would happen if the jury could not reach a verdict; and (4) the trial court's failure to admonish the jury not to surrender their honestly held convictions before dispatching the jury to deliberate further.

¶ 63 The bailiff's unauthorized and improper communication with the jury is the most troubling of the above listed factors. Pursuant to 22 O.S.1991, § 857, a jury must be sequestered between hearing the charge and returning a verdict. If after deliberations have begun the jury is allowed to separate and commingle with people outside the jury panel, prejudice to the defendant is presumed. *Bayliss v. State*, 1990 OK CR 51, ¶ 4, 795 P.2d 1079, 1080; *Howell v. State*, 1994 OK CR 62, ¶ 39, 882 P.2d 1086, 1094–95, *cert. denied*, 514 U.S. 1113, 115 S.Ct. 1968, 131 L.Ed.2d 858 (1995).

¶ 64 In this case, the bailiff was simply instructed to bring the jury to the courtroom. Rather than doing just that, she obviously had some discussion with the jury regarding the final note. Had the unauthorized communication not taken place, it is likely the court would have taken the case from the jury and sentenced Mooney to either life or life without parole.

¶ 65 The bailiff's unauthorized communication with the jury had a domino effect. Because of the communication, the course of the proceedings was altered. Rather than responding to the proffered question, the court refused to answer the question because it was not signed by the foreman. The trial court had neither instructed nor required the jury foreman to sign the previous questions sent to the court. Under these circumstances, the court's action effectively elevated the status of the foreman and vested him with unwarranted authority.

¶ 66 Furthermore, even though the jury had been deliberating approximately six hours and nearly two hours had passed since it received the *Allen* charge, the court failed to admonish the jury for a second time not to forfeit conscientiously held convictions. Juror Henry's note clearly indicated that he believed the jury was hopelessly deadlocked. The jurors should have been admonished again not to surrender their honestly held convictions.

¶ 67 Thus, under the circumstances presented here, we find the jury's death sentence was improperly coerced. This error is remedied by the Court's modification of Mooney's death sentence to life imprisonment without the possibility of parole and no further relief is required.

### Cumulative Error Review

¶ 68 In his final proposition of error, Mooney contends the accumulation of errors deprived him of a fair trial. No error occurred in the guilty/innocence stage of trial which requires reversal of Mooney's conviction. With regard to the penalty stage of trial, this allegation of error need not be addressed as this Court grants relief.

### Conclusion

¶ 69 Mooney's conviction for First Degree Malice Aforethought Murder is **AFFIRMED**, but his sentence of death is **MODIFIED** to life imprisonment without the possibility of parole.

STRUBHAR, P.J., and CHAPEL, J., concur.

LUMPKIN, V.P.J., concurs in results.

LILE, J., recuse.

LUMPKIN, Vice–Presiding Judge: concurs in results.

¶ 1 I concur in the Court's decision to affirm Appellant's conviction in this case and the modification of the sentence to Life Without Parole. However, there are several issues upon which I cannot agree to the Court's analysis.

¶ 2 First, I cannot join in the Court's misstatement of the holding in *Van White v. State*, 1988 OK CR 47, 752 P.2d 814, 820–22. This Court has not held that the State bears the responsibility of ensuring that the record is sufficient to enable the Court to conduct the mandatory sentence review. What this Court said in *Van White* is

"[a]ccordingly, we hold that under *Kelly, supra*, the failure of the court reporter to transcribe voir dire as requested by counsel for appellant in his designation of record, requires that appellant's judgment and sentence for first degree murder on Count I must be reversed and remanded for a new trial. In so holding, we specifically adopt Judge Brett's special concurrence in *Kelly, supra*, requiring that in order to effectuate this Court's mandatory sentence review obligation under 21 O.S.Supp.1985, § 701.13(C)(1), a complete stenographic record shall be taken in all capital proceedings."

*Id.* 1988 OK CR 47, ¶ 17, 752 P.2d at 821.

¶ 3 A review of Judge Brett's separate vote in *Kelly* reveals Judge Brett's language is, "I believe there should be a judicial rule in this state that, in order to effectuate this Court's mandatory obligation under 21 O.S. 1981, § 701.13, a complete stenographic record must be taken in all capital proceedings,

and I would so hold." *Kelly v. State*, 1984 OK CR 99, 692 P.2d 563, 566. Rather than misstate the holding of a case, I suggest the better practice would be merely to restate the language of that case. It is still the responsibility of an appellant to provide a record for this Court to review. Failure to do so can waive the issue on appeal.

¶ 4 I also have difficulty with the Court's generic discussion concerning the alleged unauthorized and improper communication by the bailiff with the jury. It is impossible in the course of managing a trial involving a jury to ensure that a bailiff is not going to have some verbal communication with the jurors. In fact, a part of the duties of a bailiff is to take charge of the jury and serve as a conduit to the Court regarding any needs the jury might have. Just because some communication takes place does not mean it was unauthorized or improper. It appears in this case, that whatever communication took place was of an administrative nature which this Court has never held was an inappropriate or unauthorized communication. Because of the way it is treated in the opinion, I cannot join in that analysis. In addition, I do not think this Court wants to adopt an analysis which would create an argument that any type of verbal communication between a bailiff and a jury was unauthorized and improper communication. We should distinguish between administrative matters and matters which go to the substance of their deliberation. In this particular case, I can find nothing in the record that shows this limited communication involved more than the bailiff performing her ministerial duties and no error occurred.

¶ 5 I would prefer the Court to remand this case for resentencing. However, based on the evidentiary hearing which totally impeached the testimony of David Cox, I concur in the modification of the sentence.